IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KAREN ARNOLD, ) | |
| ) | 4:04CV3351 |
| Plaintiff, ) | |
| ) | |
| v. ) | MEMORANDUM AND ORDER |
| ) | |
| SOCIAL SECURITY ADMINISTRATION, ) | |
| JoAnne B. Barnhart, Commissioner, ) | |
| ) | |
| Defendant. ) | |

Karen Arnold ("Arnold") filed an application for supplemental security income under Title XVI of the Social Security Act, ("Act") 42 U.S.C. §§ 401 *et seq.*, on July 7, 1988. Social Security Transcript ("TR") at 60-69. The Social Security Administration ("SSA") found Arnold disabled as of July 1, 1998 and entitled to social security income benefits. TR 70. On July 30, 1997, the SSA conducted a disability review and determined Arnold had a continuing disability. TR 72. The SSA initiated another review on June 2, 2001, and in November 2001, the SSA notified Arnold that she no longer met the disability requirements due to medical improvement. TR 77;98-104. The SSA advised Arnold that her benefits would terminate at the end of January 2002. TR 102.

Arnold filed a request for reconsideration on November 19, 2001, and the SSA affirmed its decision. TR 105;117. Arnold filed a request for hearing and following the hearing on March 28, 2003, Administrative Law Judge ("ALJ") Ronald D. Lahners found Arnold's disability ceased in November 2001 and entitlement to benefits terminated at the end of January 2002. TR 129;37-38. On September 10, 2004, the Appeals Council denied Arnold's request for review. TR 6-9. Arnold seeks judicial review arguing the

1

record, including the additional Epilepsy Questionnaire submitted by Terry L. Troyer, M.D., Arnold's treating physician, does not support the ALJ's decision that her medical condition improved warranting termination of her disability benefits.  This court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and the applicable law.  This court  concludes the ALJ's finding are not supported by substantial evidence on the record as a whole.

**Background**

Arnold was born on April 9, 1960, and was 42 years old at the time of the administrative hearing on March 20, 2003.  TR 60; 43-44.  Arnold completed the twelfth grade of school and attended college for half a year.  TR 45.  Arnold has no history of relevant work activity.  TR 29;139.

On June 26, 1997, Arnold saw Brian Boes, M.D. ("Boes"), for follow-up regarding her seizure disorder.  TR 163.  Boes noted Arnold had recurrent seizure disorder since the age of eight and a history of generalized tonic-clonic seizures.  *Id*.  Boes's records indicate that Arnold suffered seizures three to four times per month despite use of anti epileptic medications in the past.  *Id*.  Based on this evidence, the ALJ established the Comparison Point Decision (CPD) on July 30, 1997, the date of the most recent favorable medical decision that Arnold continued to be disabled.  TR 29;72.

On November 7, 2000, Troyer and J. Brugman, PAC ("Brugman") saw Arnold for a follow-up concerning her seizure disorder and osteoporosis. TR 218. Troyer and Brugman assessed Arnold for seizure disorder, osteoporosis, scoliosis, tobacco abuse, and status post hysterectomy.  Troyer and Brugman  noted "[Arnold] is feeling pretty good right now.

The [V]ioxx she takes for her joint soreness and stiffness really seems to control that well. [Arnold] states she would like a refill on that. She also notes that her seizures seem to be doing better." Arnold took Foxamax for osteoporosis but maintained she could not take it on a daily basis because she could not postpone eating something for a half-hour after waking. TR 218. Troyer and Brugman observed that Arnold needed "something else" if she would not comply with the medication because of fairly severe osteoporosis and Arnold could not take ERT because of a family history of breast cancer. *Id*. Troyer and Brugman concluded that Arnold had no tenderness in her spine and paraspinus muscles and she exhibited good range of motion and strength. *Id*. Further, Arnold's cranial nerves II through XII were grossly intact and her deep tendon reflexes were 2+/4+ bilaterally. *Id*. Troyer and Brugman prescribed Miacalcin for osteoporosis, and provided Arnold with refills of Dilantin, Primidone, Vioxx and calcium with vitamin D. *Id*.

Arnold underwent a disability examination by Troyer on September 21, 2001. TR 222. Troyer noted

> [s]he does have a seizure about every 3 weeks. These last from 30 seconds to 30 minutes and generally last more like 3 minutes. Some she describes more as petite mall, she will be doing something and will start to feel dizzy, starts to feel out of control and will do something. The example she gave she was holding a salad and threw it up in the air and it came down on the floor. Once this passes she is ok. Part of these sound like a tonic clonic type of seizure and she will have these about every 6 weeks and it does sound like she has tonic clonic movements and she is unaware of things at that time. Reviewed with her what she calls "wild" episodes she does with her mouth is consistent with tonic clonic seizure. She is on her current medications and seems to be doing best. She feels her seizures are fairly well controlled at this point.

*Id*. Arnold maintained that physical activity bothered her, and that if she overdid it one day,

she would suffer the next day and increase her risk of seizure.  *Id.*  Arnold stated that bending, holding her arms in the air, and hanging clothes on the clothes line caused her to suffer.  *Id.*  Arnold described having dizziness, especially before a seizure and "then off and on if she gets up too fast, walks too fast," along with upper and lower back pain.  *Id.*  Troyer noted Arnold's October 1999, bone density scan evidenced osteoporosis and a T-score of 93.6.  *Id.*

Arnold stated she suffered from neck pain, especially with lifting, and estimates that she could lift five to ten pounds, occasionally 15 pounds, although she would need to use both hands.  *Id.*  Arnold estimated she could stand about an hour a day and sit for about a half-hour a day.  *Id.*  Arnold reported that she felt low back pain from sitting too long; left arm, left elbow pain; and leg cramps alleviated by Ibuprofen and wearing slippers at night.  *Id.*  Troyer speculated whether Arnold suffered from fibromyalgia after observing several pressure areas over Arnold's lower back.  *Id.*  Arnold stated she had occasional headaches, especially after a bad seizure, and she felt her memory and thinking were "ok."  Troyer observed that Arnold had scars on her left ankle that appeared she had pins or traction at one time, but Arnold had no memory of this.  *Id.*  Additionally, Troyer referenced a marked deformity on Arnold's left elbow consistent with surgery and having her elbow rotated anteriorly, along with scoliosis of Arnold's upper and lower back.  TR 223.  Troyer reported cranial nerves II through XII were grossly intact and deep tendon reflexes were 2+/4+ and symmetrical.  *Id.*  Troyer noted Arnold appeared pleasant and cooperative and had "no trouble" getting on the exam table.  *Id.*  Troyer assessed Arnold with seizure disorder, going back many years; osteoporosis recently discovered; scoliosis; fibromyalgia;

and history of breast cancer.  *Id.*

On November 15, 2001, Arnold informed Troyer and Brugman that the SSA found her condition improved and she could return to work.  TR 236.  Troyer and Brugman noted Arnold felt upset and did not feel she could work and Troyer and Brugman agreed with her.  *Id.*  TR 235.  Arnold maintained her seizures increased over the last month and Troyer and Brugman noted Arnold's medication levels had not been checked since the previous August.  *Id.*  On February 15, 2002, Arnold had a Dilantin level of 10.3 with a reference range of 10.0 to 20.0.  TR 238.

In August 2002, Arnold presented with burns on her right knee and the 2nd and 3rd digits of her right hand.  TR 233-235.  Arnold had suffered a seizure and poured hot coffee on herself.  TR 242.  Troyer and Brugman advised Arnold to apply Silvadene to the affected areas and elevate her leg.  TR 233.  On September 6, 2002, Troyer and Brugman reported that Arnold's burns were "healing nicely."  TR 234.

At the hearing before ALJ Ronald D. Lahners on March 20, 2003, Arnold stated she and her two daughters lived with her mother and she received $292 in ADC support each month.  TR 50, 45.  Arnold reported that she completed high school, attended half a year at Kearney State College, and managed her own money matters.  TR 45.  Arnold worked at a mission for about a month, but did not remember working there or at a factory.  TR 44,53.  Arnold testified she could not work because she suffered from back pains, leg aches, osteoporosis, and seizures.  TR 46,47.  Arnold maintained she never knows when her next seizure might occur and it takes 30 to 45 minutes for her to realize she suffered a seizure.  *Id.*  Arnold stated she suffered from headaches after "wild" seizures, and does

not realize she hurt her body.  TR 47.  Arnold does not suffer from headaches after light seizures.  TR 54.  Arnold believed stress may cause her seizures as well as lack of sleep.  TR 48.

Regarding Troyer's report on the frequency of Arnold's seizures, Arnold stated that the frequency is sometimes different.  TR 50.  Arnold stated she experienced seizures at least twice a week, or once a week, and then asked her mother how often she had seizures.  TR 54.  Arnold claimed she experienced both a grand mal and a petit mal that month, one occurring in the morning and the other in the evening.  TR 48-49.  Arnold did not keep track of her seizures and reported that sometimes she would have grand mal seizures one after another.  TR 50.  Arnold maintained that she did not know much about her seizures, but her mother knows about the seizures.  TR 50.

Arnold takes calcium for her bones; Nitricin, a generic pain pill; and Dilantin and Primidone for epilepsy.  TR 46-47.  Arnold no longer takes Vioxx and her generic medication does not work as well as Vioxx.  TR 49.  Arnold maintains that she takes her medications every day.  TR 51.  Arnold visits Troyer every six months to get her blood checked and when she suffers from a burn or other injury during a seizure.  TR 51.

Arnold sits and stands during the day and can sit for a couple hours at a time.  TR 51-52.  Arnold does laundry and during the summer, she hangs clothes on the clothesline, even though she has a backache afterwards.  TR 52.  Arnold stated she does not exercise, but can walk up and down stairs, although it bothers her.  TR 52.  Arnold walks three or four blocks to the store and can carry items home.  TR 52-53.

Gail F. Leonhardt ("Leonhardt"), a rehabilitation counselor,  testified as a vocational expert at the hearing, under contract with the Office of Hearings and Appeals of the SSA.

TR 54;254;36. The ALJ asked Leonhardt to assume a person of Arnold's same age, education, and work experience. TR 55. The ALJ stated this person could lift 20 pounds on occasion, 10 pounds on a frequent basis, sit for six hours, and stand for six hours in a eight-hour workday with normal breaks. *Id.* Further, this person could stoop, crouch, bend, kneel, and balance; could not climb ladders or scaffolds; should stay away from heights or open machinery; and might have an unexpected grand mal seizure lasting up to 30 minutes in a six week period and a petit mal seizure lasting about three minutes every three weeks. TR 56. Leonhardt listed various occupations for a person with these restrictions including: cashier, telephone solicitor, and a light cleaner. *Id.* Leonhardt testified that 1,500 light and 200 sedentary cashier occupations existed, as well as 1,469 sedentary telephone solicitor positions, and 1,000 light cleaning positions. TR 57-58.

When Arnold filed her appeal to the Appeals Council, she submitted new evidence including an Epilepsy Questionnaire from Troyer (TR 13-17; 265-269), progress notes from Troyer, and x-ray reports from Boone County Health Center evidencing a pelvic fracture Arnold suffered during a seizure on December 17, 2003 (TR 270-274). In his progress notes dated December 2003 through February 2004, following Arnold's pelvic fracture, Troyer reported that Arnold exhibited pain and he prescribed Lortab. TR 270. Troyer documented that Arnold: used crutches; had head congestion and a cough that improved; experienced pain while bending and laying down; and felt tenderness with flexion of the right hip. TR 270-72. On January 16, 2004, Troyer reported that Arnold suffered "a seizure on Sunday" and Arnold's daughter caught Arnold before she completely fell. TR 271. In a progress note dated February 3, 2004, Troyer noted Arnold walked some without crutches and "is doing much better." TR 272.

7

In his Epilepsy Questionnaire, Troyer categorized Arnold's prognosis as poor and reported she suffered, on average, two grand mal seizures per week, each lasting five minutes, and three petit mal seizures per week, each lasting one minute. TR 13. Troyer further noted that Arnold had no warning regarding her seizures and she suffered from exhaustion during the day after severe seizures. TR 14. Troyer reported that Arnold complied with taking her medications, and circled "dizziness," "coordination disturbance," and "lack of alertness," as symptoms of the medication. TR 16. Troyer indicated that Arnold: required more supervision at work than an unimpaired worker; could not drive; could not work with power machines that require an alert operator; and could not work around heights. TR 17. Troyer checked "no" in response to the question whether Arnold could engage in competitive employment on a regular, sustained and productive basis. *Id.* The Appeals Council received this additional evidence and denied Arnold's request for review. TR 9;6.

**Legal Standard**

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering . . . his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country." 42

U.S.C. § 432(d)(2)(A).

An ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines

> any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. *See* 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. *See Braswell*, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. *See id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

A determination of whether an adult continues to be eligible to receive supplemental security income benefits requires an evaluation of any medical improvement in the claimants impairments. The SSA defines "medical improvement" as

> any decrease in the medical severity of the claimant's impairment(s) which was present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with claimant's impairment(s). . . . [T]he key question is not whether the claimant still suffered from the same medical problem he had when benefits were awarded, but whether the severity of the problem had decreased sufficiently to enable him to engage in gainful activity.

*Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citation and textual changes omitted) (*quoting* 20 C.F.R. § 416.994a(c) (2006)).

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir.1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)).

In determining whether the evidence in the record as a whole is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If the court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently. *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the

10

opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (*quoting* 20 C.F.R. § 404.1527(d)(2) (2006). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

**Discussion**

**A.      ALJ's Findings**

Based on the record, the ALJ determined Arnold suffers from epilepsy and osteoporosis. TR 37. The ALJ maintained that while Arnold's medical impairment did not reveal the same or equivalent attendant medical findings recited in Appendix 1 to Subpart P of the SSA's Regulation No. 4,[1] they imposed some limitations on Arnold's ability to perform basic work-related functions. *Id.* The ALJ concluded that notwithstanding Arnold's limitations, her medical improvement since the CPD indicated she possessed the ability to work. *Id.* Under 20 C.F.R 416.929, Social Security Ruling 96-7p, *and Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the ALJ determined that while Arnold's testimony exhibited credibility, it did not support a finding of continued disability. *Id.* Accordingly, the ALJ found Arnold not disabled pursuant to the Social Security Act; her disability ceasing

---

[1]The ALJ notes that "according to Sections 201.00(a) and 202.00(a) of Appendix 2 to Subpart P of the Social Security Administration Regulations No. 4, the Commissioner of Social Security has taken administrative notice of the existence of approximately 1,600 separate sedentary and light unskilled occupations in the national economy. The ability to perform all or significantly all of those occupations is the ability to perform the 'full range' of such work." TR 36.

on November 1, 2001; and Arnold's entitlement to supplemental security income benefits terminated on January 31, 2002. TR 38. Arnold submitted new evidence to the Appeals Council consisting of an Epilepsy Questionnaire from Troyer (TR 13-17; 265-269), progress notes from Troyer, and x-ray reports from Boone County Health Center evidencing a pelvic fracture Arnold suffered during a seizure on December 17, 2003 (TR 270-274). The Appeals Council denied Arnold's request for review. TR 6.

## B. Evidence on the Record

Arnold argues that in light of the new evidence submitted to the Appeals Council, the record does not support the ALJ's determination that Arnold's condition improved and Arnold does not meet the listing of impairments. Based on a review of the evidence, this court finds that substantial evidence does not exist in this record to support the ALJ's finding that Arnold's condition improved such that she does not meet or equal the impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.00, 11.02 and 11.03.

Two listings for epilepsy exist in the listing of impairments. Section 11.02 states:

> Epilepsy - convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
> With
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (2004). Section 11.03 covers petit mal, psychomotor, or focal seizures and requires that seizures must be "documented by detailed description of a typical seizure pattern, including all associated phenomena;

12

occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (2004).

Arnold disagrees with the ALJ's determination of improvement in Arnold's condition since the CPD.  The ALJ cited Troyer's September 21, 2001 report in which Troyer stated Arnold had petit mal seizures approximately every three weeks, and a tonic clonic seizure every six weeks.  Additionally, the ALJ noted Troyer's report where Arnold claimed her "seizures [were] fairly well controlled at this point."  TR 222.  The ALJ determined no reports of seizures existed prior to Arnold's February 14, 2002, visit.  However, at this visit, Arnold maintained her seizures increased over the last month.  TR 235.  Troyer and Brugman noted Arnold's medication levels had not been checked since the previous August.  *Id*.  A subsequent test revealed Arnold had a Dilantin level of 10.3 with a reference range of 10.0 to 20.0.  TR 238.  At the hearing, the ALJ referenced this February Dilantin level and specifically asked Arnold if she took her medication during that time.  TR 51.  Arnold responded that she took her medication everyday.  *Id*.

Furthermore, at the hearing, Arnold stated the frequency of her seizures differed and provided examples of seizures she experienced that month and said she sometimes had "grand mal's all the time, right after another."  TR 50.  Arnold maintained that she does not always know when she has seizures and relies on others to inform her.  TR 53.  The frequency of seizures is also documented in Troyer's Epilepsy Questionnaire, thereby supporting listing impairment § 11.02A.  In this Questionnaire, Troyer indicated that Arnold averaged 3 petit mal seizures per week and 2 grand mal seizures per week.  TR 265.  In progress notes related to Arnold's pelvic fracture, Troyer states "[Arnold] has a seizure and fell on 12/17/03."  TR 271.  Arnold's most recent documented seizure is reflected in

13

Troyer's January 1, 2004, entry: "[d]o note [Arnold] had a seizure on Sunday.  Her daughter was with her and caught her as falling down [sic] but she did not fall completely and does not feel like she injured it more."  TR 271.

At an appointment on November 15, 2001, Arnold informed Troyer and Brugman that the SSA found her condition improved and she could return to work.  TR 236.  Troyer and Brugman agreed that Arnold is not able to work.  *Id.*  As Arnold's treating physician, Troyer's opinions regarding Arnold's seizure frequency and Arnold's ability to work should have been granted "controlling weight."  The Appeals Council failed to consider Troyer's opinions and the record as a whole.  The record is clear that Arnold suffers from epilepsy and osteoporosis and the record does not "clearly show[ ] medical improvement" since the CPD, as the ALJ suggests.  Accordingly, the Appeals Council did not appropriately weigh Troyer's opinions and Epilepsy Questionnaire.  This court finds that Arnold continues to meet the criteria of Listing Impairment § 11.02A and that there has been no improvement in her medical condition sufficient to justify termination of Arnold's disability benefits.

The hypothetical the ALJ posed to Leonhardt failed to include potential injury due to seizure, memory loss, side effects of medication, and exhaustion.  Arnold's seizure episodes may not be totally disruptive in a home environment, but could hardly be accommodated in the workplace.  Even Leonhardt admitted that "[t]he seizure situation, could cause problems with an employer, or maybe not.  Other [sic] maybe they would accommodate, that's an employer preference thing I guess."  As further evidence, Troyer checked "no" in response to the question whether Arnold could engage in competitive employment on a regular, sustained and productive basis.  TR 17.  In short, Leonhardt's opinion is not substantial evidence that Arnold would be able to perform the jobs the

Leonhardt identified.

When reviewing an ALJ's opinion not to extend supplemental security income benefits, the court will affirm the ALJ's opinion if it is supported by substantial evidence on the record. Substantial evidence supporting the ALJ's decision is lacking given the opinion of Arnold's treating physician, the Epilepsy Questionnaire, and Arnold's documented seizure activity and resultant injuries. Accordingly, this court concludes the ALJ's decision that Arnold is no longer disabled is unsupported by substantial evidence in the record as a whole.

THEREFORE, IT IS ORDERED that the findings and conclusions of the ALJ are reversed and benefits are awarded. A separate judgment shall be entered in conjunction with this Memorandum and Order.

DATED this 14th day of July, 2006.

BY THE COURT:

s/Joseph F. Bataillon
JOSEPH F. BATAILLON
United States District Judge